UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATALIA ZARYCKYJ,

     Plaintiff,

                                 Case No. 26-cv-

-vs-

                                 Hon.

VOLTAVA, LLC and DETROIT
MANUFACTURING SYSTEMS, LLC,
jointly and severally,

     Defendants.

---

Jennifer L. McManus (P65976)
FAGAN MCMANUS, P.C.
Attorneys for Plaintiff
25892 Woodward Avenue
Royal Oak, MI  48067-0910
(248) 542-6300
jmcmanus@faganlawpc.com

---

## COMPLAINT AND JURY DEMAND

There is no other pending or resolved civil action
arising out the transaction or occurrence
alleged in the complaint.

NOW COMES Plaintiff, Natalia Zaryckyj, by and through her attorneys,

FAGAN MCMANUS, P.C., and hereby brings this action against Defendants

Voltava, LLC and Detroit Manufacturing Systems, LLC, and alleges, on

knowledge as to her own actions and otherwise upon information and belief,

1

as follows:

## PARTIES

1.      Plaintiff Natalia Zaryckyj ("Plaintiff") is an individual who resides in Beverly Hills, Michigan.

2.      Plaintiff is a citizen of the State of Michigan.

3.       Upon information and belief, Defendant Voltava, LLC ("Voltava") is a limited liability company that does business at 2155 Executive Hills Blvd., Auburn Hills, Michigan 48326.

4.      Upon information and belief, Defendant Detroit Manufacturing Systems, LLC ("DMS") is a limited liability company that does business at 2155 Executive Hills Blvd., Auburn Hills, Michigan 48326.

5.      Voltava and DMS, collectively, are hereinafter referred to as "Defendants."

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States, including 42 U.S.C. § 1981and the False Claims Act, 31 U.S.C. § 3730(h).

7.      This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy under Article III

2

of the United States Constitution.

8.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## GENERAL ALLEGATIONS

9.     Plaintiff began employment with Defendants in July 2023 as Chief Financial Officer.

10.    Plaintiff is 54 years old.

11.    Shortly after Plaintiff began her employment, Bruce Smith directed Plaintiff to work with Palm Tree, LLC to support Defendants' acquisition of Android Industries, LLC.

12.    Palm Tree, LLC was responsible for valuation analysis, buyer's quality of earnings, a five-year pro forma financial model, and the debt financing model relied upon by lenders for the acquisition.

13.    No alternative investment banking firms were considered for the transaction due to Bruce Smith's longstanding relationship with Steve Richards, the investment banker at Palm Tree, LLC.

14.    Throughout 2024 and 2025, Palm Tree, LLC frequently withheld the financial model from Plaintiff or provided it in unusable Excel formats.

15.    In early 2025, Plaintiff hired Stephen Wieczorek as Head of

FP&A and instructed him to request a working version of the financial model.

16.    Stephen Wieczorek reported that Palm Tree, LLC was uncooperative and dismissive of his requests for the model, which was consistent with Plaintiff's own experience.

17.    In November 2025, Plaintiff and Mr. Wieczorek obtained a workable version of the financial model by reconstructing it into a new Excel file.

18.    During the pre-closing period in 2025, General Motors, a critical OEM customer, reviewed the proposed acquisition and determined that the combined company would operate under heightened financial risk due to its leverage position following the acquisition.

19.    General Motors withheld its required consent to the transaction until accommodation and access agreements were negotiated and executed to protect against financial distress and ensure operational continuity.

20.    The closing of the acquisition was delayed from May 2025 to December 12, 2025, after General Motors' conditions were satisfied

21.    During a November 2025 trip to a conference in Palm Springs, Bruce Smith expressed strong optimism regarding Plaintiff's long-term future with Defendants and referenced Plaintiff's anticipated travel to Brazilian operations.

22.    The acquisition of Android Industries, LLC closed on December 12, 2025.

23.    After the closing, Android Industries began providing financial information directly to Plaintiff, revealing that the financial forecast for 2026 materially differed from Palm Tree's modeled projections.

24.    Plaintiff instructed Mr. Wieczorek to request from Palm Tree, LLC the supporting assumptions and financial bridges to reconcile the differences between actual results and the model.

25.    Palm Tree, LLC was owed approximately $8.7 million in fees related to the acquisition, a portion of which was owed to Steve Richards.

26.    Steve Richards asked Bruce Smith to withhold payment to Palm Tree, LLC while he engaged legal counsel regarding a compensation dispute.

27.    Bruce Smith instructed Plaintiff not to release payment to Palm Tree, LLC until Mr. Richards had the opportunity to consult counsel.

28.    Steve Richards told Plaintiff that Palm Tree, LLC was running a "Ponzi scheme."

29.    Plaintiff consulted Foster Swift regarding the risks of delaying payment and was advised that withholding payment was permissible if within contractual terms.

30.    Steve Richards reached an agreement with Palm Tree, LLC, and Plaintiff was advised to release payment before year-end 2025.

31.    Between December 15, 2025 and January 16, 2026, Plaintiff identified margin discrepancies between the model presented by Andy Schmidt, Chief Commercial Officer of Android, and the Palm Tree model for the Dakkota takeover from Stellantis.

32.    Plaintiff exchanged emails with Andy Schmidt, Bruce Smith, and Steve Richards questioning the assumptions in the Palm Tree model regarding the takeover's profitability.

33.    In mid-January 2026, Plaintiff learned from Bruce Smith that Steve Richards was considering separating from Palm Tree, LLC and forming his own advisory business.

34.    After inquiry by Plaintiff, Bruce Smith indicated that Steve Richards was subject to a non-compete agreement and that Defendants were a significant client of Palm Tree, LLC.

35.    Bruce Smith mentioned to Plaintiff that he was considering bringing Steve Richards on as a direct consultant or board member and providing him with sign-on compensation.

36.    On January 19, 2026, Bruce Smith convened a meeting in Auburn Hills, Michigan, attended by Plaintiff, Andy Schmidt, Scott Cieslak,

6

Brad Gapczynski, Larry LaPointe, Stephen Wieczorek, Anthony Laverde, Todd, and Steve Richards (by phone).

37.   In the week prior to the meeting, Plaintiff had raised concerns that the Palm Tree model reflected inflated profit margins for the Dakkota takeover business from Stellantis.

38.   The margins communicated by Andy Schmidt after the acquisition were materially lower than those modeled by Steve Richards.

39.   During the meeting, Stephen Wieczorek stated that plant contribution was not the appropriate metric and that total profitability after allocation of shared corporate expenses should have been evaluated.

40.   On or about January 20, 2026, Bruce Smith instructed Plaintiff to terminate Stephen Wieczorek, stating he disagreed with Mr. Wieczorek's financial views.

41.   On January 26, 2026, Plaintiff terminated Stephen Wieczorek and assumed responsibility for continuing to analyze the acquisition model prepared by Steve Richards and to reconcile discrepancies.

42.   Starting the week of January 19, 2026, Wells Fargo, the lead bank on the $450 million revolving credit facility, contacted Plaintiff to request a meeting after identifying variances in collateral levels compared to the Palm Tree model.

43.    On February 2, 2026, Plaintiff attended a meeting with Wells Fargo, where Barry Felker stated that the banks expected significantly higher collateral levels based on the Palm Tree financing model and requested explanation for the discrepancies.

44.    Plaintiff explained that the primary drivers of the variance included the Novelis fire, timing of the Dakkota takeover, and holiday shutdown effects.

45.    Barry Felker requested a detailed follow-up analysis quantifying the variance drivers.

46.    Following the meeting, Treasurer Bojan Belejkovski expressed concerns to Plaintiff that the Palm Tree model overstated collateral by including ineligible assets.

47.    Plaintiff requested that Mr. Belejkovski summarize the major differences between the collateral assumptions made by Palm Tree and actual results.

48.    After the call, Plaintiff informed Bruce Smith that lenders were questioning discrepancies between model projections and actual results, and that the model contained deeply flawed assumptions.

49.    Around February 4, 2026, an executive meeting was held in Auburn Hills to discuss management vision and mission.

8

50. After this meeting, Jennifer Neumann's oversight and tone toward Plaintiff increased significantly, including scrutiny of routine Finance matters such as the T&E policy rollout and Michigan Sales & Use Tax audit.

51. On numerous occasions during meetings, Jennifer Neumann asked Plaintiff to repeat words as if her English were unclear, causing Plaintiff to feel embarrassed, disrespected, and self-conscious about her accent.

52. On February 12, 2026, Plaintiff reached out to Chief People Officer Monica Brand seeking guidance regarding her interactions with Jennifer Neumann and reported feeling disrespected.

53. Monica Brand responded that she would try to call Plaintiff that afternoon or as soon as she had a break.

54. Plaintiff did not receive any further follow-up from Monica Brand regarding her concerns about Jennifer Neumann.

55. After assuming responsibility for the 2026 combined budget, Plaintiff identified a material capital expenditure omission: the model reflected $50 million total CAPEX, while combined financials showed $94 million for the seller and $18 million for the buyer, totaling $112 million.

56. Had the accurate amount been modeled, the model would have shown that the company would have breached covenants in Q1 2026.

57.   In early February 2026, Plaintiff met with Bruce Smith to explain the discrepancy and told him that Steve Richards had been negligent.

58.   Shortly after, Bruce Smith called Steve Richards and then dialed Plaintiff into the call, during which Plaintiff was directed to confront Mr. Richards regarding the omission of a new Lake Orion program requiring close to $30 million in investments.

59.   Steve Richards stated he knew of the commitment but did not know the exact amount to include in the model and therefore did not include it, and he apologized.

60.   Plaintiff responded that a reasonable estimate should have been modeled, particularly given its materiality.

61.   Plaintiff stated that while she would try to reposition or eliminate CAPEX, lenders would have to be alerted if it was not possible.

62.   Plaintiff had two separate conversations with Andy Schmidt, who confirmed that he had informed Steve Richards that the investment was $25–30 million.

63.   Plaintiff also had conversations with Finance staff member Larry LaPointe, who confirmed that information on the magnitude of the investment had been relayed to Steve Richards.

64.   Around February 9–10, 2026, Plaintiff consulted Foster Swift

attorney Rob Hamor regarding covenant compliance issues, noted that the financial information was inaccurate, and stated she was not comfortable certifying financial information that was not accurate.

65. Following identification of the CAPEX discrepancy, Plaintiff advised the executive team via email that immediate action to reduce CAPEX was needed and that Finance would work with CAPEX owners to determine what could be canceled or delayed.

66. After a two-week exercise, the CAPEX reduction was completed on February 13, 2026, reducing CAPEX to approximately $80 million through deferrals and cancellations.

67. The revised budget narrowly passed covenant thresholds in Q1 and Q2, with January and February 2026 still showing a covenant breach but for the technicality that reporting was only required at quarter-end.

68. Treasurer Bojan Belejkovski's monthly cash flow models showed covenant failures until the final version after CAPEX adjustments, and liquidity required careful management.

69. On or about February 17, 2026, Plaintiff informed Bruce Smith and Steve Richards via email that the covenant compliance issues had been addressed but that there was still risk and that $25 million in new leasing sources would be needed to maintain compliance.

11

70.    On February 19, 2026, Plaintiff was terminated without cause.

71.    Plaintiff was immediately replaced by Steve Richards, a 42-year-old white male with no prior CFO experience.

72.    Plaintiff is a 54-year-old female of Brazilian national origin.

73.    In the five weeks preceding her termination, Plaintiff repeatedly raised concerns that the financial model prepared by Steve Richards contained material omissions and unrealistic assumptions, and concealed covenant and liquidity risks that were meant to mislead lenders.

74.    Plaintiff also raised concerns regarding compensation payments to Bruce Smith that could potentially violate a negative covenant in the company's credit agreement limiting CEO compensation to $1 million per calendar year.

75.    Plaintiff reviewed the credit agreement and confirmed that the covenant referred to compensation paid within the calendar year, not compensation earned for a prior year, and explained this to Bruce Smith.

76.    Plaintiff instructed the treasurer to pay the bonus and to model the remaining payments to identify when a breach would occur, which was projected for Q3 2026.

77.    Plaintiff performed well throughout her employment, achieving all bonus and merit-based compensation and being selected to serve as CFO

of Voltava.

78.     Plaintiff filed a Charge of Discrimination with the Equal Opportunity Commission on March 30, 2026, Charge no. 471-2026-04215, asserting claims of gender, age and national origin discrimination.

79.     Plaintiff's EEOC Charge remains pending.  It is her intention to amend this Complaint upon receipt of a Right to Sue in order to add her claims pursuant to Title VII of the Civil Rights Act and the Age Discrimination in Employment Act.

## CAUSES OF ACTION

### COUNT I - 31 U.S.C. § 3730 FALSE CLAIMS ACT RETALIATION

80.     Plaintiff repeats and realleges the above allegations as if fully set forth herein.

81.     Pursuant to 31 U.S.C. § 3730(h), it is illegal to terminate an employee for reporting or taking efforts to stop activity that is in violation of 31 U.S.C. § 3729.

82.     Plaintiff objected to, reported, and took efforts to stop activity that is in violation of 31 U.S.C. §3729 by disclosing, objecting to and refusing to certify inaccurate and misleading financial information that was used to obtain lender financing from an FDIC insured lender.

83.     Plaintiff was terminated in retaliation for these protected

13

disclosures, objections and refusals.

84. As a direct and proximate result of Defendants' retaliatory and conduct toward Plaintiff in violation of 31 U.S.C. §3730, Plaintiff has suffered and in the future will suffer damages including, but not limited to:

(a) Loss of wages and other forms of compensation, both in the past and in the future;

(b) Loss of the value of benefits, both in the past and in the future;

(c) Loss of promotional opportunities;

(d) Loss of earning capacity;

(e) Extreme embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

(f) Other injuries and damages that become known through the discovery process.

85. Plaintiff also seeks equitable relief, including back-pay, front-pay, attorney fees, and other equitable relief the Court deems appropriate.

## COUNT II - 42 U.S.C. § 1981 NATIONAL ORIGIN DISCRIMINATION

86. Plaintiff repeats and realleges the above allegations as if fully set forth herein.

87. 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, prohibits discrimination in employment based upon national origin and/or heritage.

14

88. Notwithstanding the duties owed to Plaintiff pursuant to 42 U.S.C. §1981, Defendants discriminated against Plaintiff based upon her national origin and/or heritage and created a hostile work environment including, but not limited to:

> (a) Treating Plaintiff differently than similarly situated individuals outside the protected class;
>
> (b) Terminating Plaintiff's employment in order to replace her with a non-Brazilian employee.
>
> (c) Other acts of discrimination to be determined through discovery.

89. As a direct and proximate result of Defendants' discriminatory conduct toward Plaintiff in violation of 42 U.S.C. §1981, Plaintiff has suffered and in the future will suffer damages including, but not limited to:

> (a) Loss of wages and other forms of compensation, both in the past and in the future;
>
> (b) Loss of the value of benefits, both in the past and in the future;
>
> (c) Loss of promotional opportunities;
>
> (d) Loss of earning capacity;
>
> (e) Extreme embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;
>
> (f) Other injuries and damages that become known through the discovery process.

90.     Plaintiff also seeks equitable relief, including back-pay, front-pay, attorney fees, and other equitable relief the Court deems appropriate.

91.     The above-referenced discriminatory conduct by Defendants toward Plaintiff was malicious and/or engaged in with reckless indifference to Plaintiff's federally protected civil rights and, as a result, Plaintiff is entitled to punitive damages.

### COUNT III - ELLIOTT-LARSEN CIVIL RIGHTS ACT GENDER AND AGE DISCRIMINATION

92.     Plaintiff repeats and realleges the above allegations as if fully set forth herein.

93.     Under Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. L. § 37.2102, ("ELCRA"), Michigan recognizes that, in employment, freedom from discrimination because of a person's protected characteristic, including gender and age, is a civil right.

94.     Defendants are employers within the meaning of the ELCRA. § 37.2201.

95.     Plaintiff was discriminated against by Defendants based upon her gender and age as set forth in the General Allegations of the Complaint.

96.     Plaintiff is a female who was qualified for her position and performed her job satisfactorily.

97. Plaintiff was terminated and replaced by a less qualified younger male.

98. Defendants violated Plaintiff's rights under the ELCRA, including, but not limited to, the following:

      (a)    Discriminating against Plaintiff based upon her gender and her age;

      (b)    Terminating Plaintiff's employment;

      (c)    Other acts of discrimination and retaliation to be determined through discovery.

99. As a direct and proximate result of Defendants' discriminatory conduct toward Plaintiff, Plaintiff has suffered and will in the future suffer damages including, but not limited to:

      (a)    Loss of wages and other compensation, both in the past and in the future;

      (b)    Loss of the value of benefits, both in the past and in the future;

      (c)    Loss of earning capacity;

      (d)    Loss of promotional opportunities;

      (e)    Extreme embarrassment, humiliation, emotional distress, mental anguish, disappointment, outrage and indignity;

      (f)    Exemplary damages;

      (g)    Attorney fees;

(h) Other injuries and damages that become known throughout the discovery process.

100. Plaintiff also seeks equitable relief, including back-pay, front-pay, attorney fees, and other equitable relief the Court deems appropriate.

## COUNT IV - MICHIGAN WHISTLEBLOWER PROTECTION ACT

101. Plaintiff repeats and realleges the above allegations as if fully set forth herein.

102. Pursuant to MCL 15.362:

"An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally, or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to laws of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by the public body, or a court action."

103. Defendants are considered an "employer" under the statute.

104. Plaintiff reported, verbally and in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to the law of this state, a political subdivision of this state, or the United States to a public body, namely a licensed attorney.

105. Plaintiff's reports included a report of illegal activity including

18

material omissions and misleading assumptions in the financial model used to obtain lender financing, and she further stated that she refused to certify inaccurate financial information

106. Defendants were aware of Plaintiff's reports to a licensed attorney.

107. Such conduct by Plaintiff was protected activity under the Michigan Whistleblower's Protection Act, MCL 15.362.

108. Plaintiff suffered adverse employment action in the form of termination shortly after engaging in this protected activity.

109. There is a causal connection between Plaintiff's protected activity and her termination.

110. Defendants' action in terminating Plaintiff's employment was in retaliation for Plaintiff engaging in protected activity under MCL 15.362.

111. As a direct and proximate result of Defendants' retaliatory conduct in violation of MCL 15.362, Plaintiff has suffered and will in the future suffer damages including, but not limited to:

    (a)    Loss of wages and earning potential;

    (b)    Loss of employee benefits;

    (c)    Loss of promotional opportunities;

    (d)    Loss of professional esteem and consequent damage to Plaintiff's professional career;

19

(e)   Embarrassment, humiliation, inconvenience, mental anguish, indignity, outrage and disappointment;

(f)   Exemplary damages;

(g)   Other damages to be determined through discovery.

112.   Plaintiff also seeks equitable relief, including back-pay, front-pay, attorney fees, and other equitable relief the Court deems appropriate.

### COUNT V - MICHIGAN PUBLIC POLICY

113.   Plaintiff repeats and realleges the above allegations as if fully set forth herein.

114.   As described above, Plaintiff exercised her rights and otherwise engaged in protected activity by exercising her responsibility to raise concerns, and refusing to acquiesce in, violations or suspected violations of state and/or federal laws governing procurement of financing from an FDIC insured bank.

115.   Defendants, through their agents, servants, clients or employees, violated the public policy of the State of Michigan by retaliating against her and terminating her for engaging in the above referenced protected activity.

116.   Defendants' actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

20

117. The temporal proximity between Plaintiff's protected activity and Defendants' materially adverse employment action is also a clear indicator of retaliatory conduct.

118. As a direct and proximate result of Defendants' retaliatory conduct toward Plaintiff, Plaintiff has suffered and, in the future, will suffer damages including, but not limited to:

(a) Loss of wages and other forms of compensation, both in the past and in the future;

(b) Loss of the value of benefits, both in the past and in the future;

(c) Loss of promotional opportunities;

(d) Loss of earning capacity;

(e) Extreme embarrassment, humiliation, mental anguish, disappointment, outrage and indignity;

(f) Exemplary damages;

(g) Other injuries and damages that become known through the discovery process.

119. Plaintiff also seeks equitable relief, including back pay, front pay, attorney fees, and other equitable relief the Court deems appropriate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Natalia Zaryckyj respectfully requests that this Court:

21

120. Declare that Voltava, LLC and Detroit Manufacturing Systems, LLC violated Plaintiff Natalia Zaryckyj's rights as set forth in this Complaint.

121. Enjoin Voltava, LLC and Detroit Manufacturing Systems, LLC from engaging in further unlawful employment practices in violation of the above statutes and public policy, including but not limited to discrimination and retaliation based on gender, national origin, age, and protected whistleblower activity.

122. Award Plaintiff Natalia Zaryckyj reinstatement to her former position or, in the alternative, front pay in lieu of reinstatement, as permitted by law.

123. Award Plaintiff Natalia Zaryckyj all lost wages, salary, bonuses, benefits, and other compensation, in an amount to be determined at trial.

124. Award Plaintiff Natalia Zaryckyj compensatory damages for emotional distress, humiliation, pain and suffering, and loss of professional reputation, in an amount to be determined at trial.

125. Award Plaintiff Natalia Zaryckyj punitive damages against Voltava, LLC and Detroit Manufacturing Systems, LLC, to the extent permitted by law, for their willful and malicious violations of Plaintiff's rights.

126. Award Plaintiff Natalia Zaryckyj her reasonable attorneys' fees, expert witness fees, and costs of suit.

127.  Award Plaintiff Natalia Zaryckyj prejudgment and post-judgment interest as permitted by law.

128.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

FAGAN MCMANUS, P.C.

By: /s/ *Jennifer L. McManus*
Jennifer L. McManus  (P65976)
Attorney for Plaintiff
25892 Woodward Avenue
Royal Oak, MI  48067-0910
(248) 542-6300
Dated:  May 19, 2026          jmcmanus@faganlawpc.com

## PLAINTIFF'S DEMAND FOR JURY TRIAL

NOW COMES the above-named Plaintiff, by and through her attorneys, FAGAN MCMANUS, P.C., and hereby demands trial by jury in the above matter.

Respectfully submitted,

FAGAN MCMANUS, P.C.

By: /s/ *Jennifer L. McManus*
Jennifer L. McManus  (P65976)
Attorney for Plaintiff
25892 Woodward Avenue
Royal Oak, MI  48067-0910
(248) 542-6300
Dated:  May 19, 2026          jmcmanus@faganlawpc.com